IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| LORA AISTROP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil No. 2:19-cv-171 |
| v. ) | Jury Demand |
| ) | |
| CONTOUR MORTGAGE CORPORATION, ) | |
| and TONY HUFF, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

### I. PRELIMINARY STATEMENT

1. Plaintiff Lora Aistrop, through counsel, brings this action against her former employer Defendant Contour Mortgage Corporation, for unlawful harassment and discrimination based on sex and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a), the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* She also brings claims against Defendant Contour Mortgage for retaliating against her for reporting and complaining about harassment and discrimination, in violation of Title VII, 42 U.S.C. §2000e-3(a), the ADEA, and THRA. Plaintiff Aistrop brings related claims against her former supervisor, Defendant Tony Huff, for common law assault and battery, intentional infliction of emotional distress, defamation, and malicious harassment in violation of Tenn. Code Ann. § 4-21-701, and she brings the same claims against her former employer Contour Mortgage Company to the extent it is vicariously liable for actions committed by Defendant Huff in the course and scope of his employment.

Plaintiff Aistrop seeks to correct unlawful employment practices and to obtain redress for damages she suffered as a result of Defendants' unlawful actions against her.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. §1331, because this case involves claims brought under the laws of the United States, namely Title VII and the ADEA. The Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) to address the state law claims, which are substantially related to the events giving rise to the federal statutory claims as to be part of the same case or controversy.

3. This Court's exercise of jurisdiction is also appropriate pursuant to 28 U.S.C. § 1332(a)(1), based on diversity of citizenship between Defendant Contour, a foreign corporation, and Plaintiff, a resident and citizen of the State of Tennessee who is seeking over $75,000 in damages.

4. Venue in the Eastern District of Tennessee, Northern Division at Greeneville, is appropriate pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district in Sullivan County, Tennessee.

## III. PARTIES

5. Plaintiff Lora Aistrop ["Plaintiff Aistrop" or "Ms. Aistrop"] is currently living in Davidson County, Tennessee, but at the time of the events giving rise to this lawsuit, she was a resident of Hawkins County, Tennessee. Ms. Aistrop is a female, over the age of 40, and was employed by Defendant Contour Mortgage Corporation from February 13, 2017, until she was terminated on June 30, 2019.

6. Defendant Contour Mortgage Corporation ["Contour"] is incorporated under the laws of Delaware, with its principal office in the state of New York. It is registered to do business in Tennessee. Its principal office and mailing address are located at 990 Stewart Avenue, Suite 660, Garden City, NY 11530-4853. Its registered agent for service of process in Tennessee is: Registered Agent Solutions, Inc., 992 Davidson Drive Suite B, Nashville, TN 37205-1051. Defendant operates offices and satellite locations in several states, including an office in Sullivan County, Tennessee, located at 223 East Center Street, Kingsport, TN 37660, where Ms. Aistrop worked with Defendant Tony Huff. Defendant Contour employs several hundred employees throughout its many offices.

7. Defendant Tony Huff ["Huff"] was Ms. Aistrop's supervisor and the manager of the Kingsport, Tennessee office of Contour Mortgage Corporation during the events described below. Defendant Huff is a resident of Tennessee, and upon information and belief, he can be served with process at the following address: 223 East Center Street, Kingsport, TN 37660.

## IV. CONDITIONS PRECEDENT

8. Ms. Aistrop timely and dually filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and Tennessee Human Rights Commission (THRC) alleging that Defendant Contour engaged in unlawful employment practices in violation of Title VII and the ADEA. The EEOC issued a Dismissal and Notice of Rights letter dated September 30, 2019.

9. This Complaint is timely filed in this Court after exhaustion of the administrative process and within ninety days from the date Ms. Aistrop received the notice of her right to file a lawsuit in court. All administrative conditions precedent to filing this action have been met.

## V. STATEMENT OF FACTS

10. In November 2016, Ms. Aistrop was working as the Finance and Insurance Manager for a Powersports dealership in Kingsport, Tennessee, but after about eleven years in that position, she was considering a new career path. A friend introduced her to Defendant Huff, who operated a mortgage office in Kingsport, Tennessee. After meeting Ms. Aistrop, Defendant Huff offered her a job as his personal assistant, account executive, and office manager. Ms. Aistrop resigned from her management job to accept Defendant Huff's offer of employment.

11. The first time Ms. Aistrop ever met Defendant Huff was in November 2016, when she met with him to discuss the possibility of a job.

12. When Ms. Aistrop first began working with Defendant Huff, his mortgage office in Kingsport was affiliated with and operated under the name of Integrity First Mortgage. In February 2017, Defendant Huff's office was acquired by Defendant Contour and assumed the name of Contour Mortgage Corporation. Ms. Aistrop became an employee of Defendant Contour on or about February 13, 2017, with a position title of Mortgage Account Executive.

13. Ms. Aistrop's primary task was to assist Mr. Huff and the Kingsport branch in acquiring and maintaining mortgage loans. Her job duties included developing new business through attending and hosting business functions and making sales calls, maintaining current business, assisting in loan processing, and assisting in the general management and marketing of the mortgage office. In addition, Mr. Huff also assigned to her duties related to other businesses that he independently operated or personally owned, including a local marina and storage facility.

14. Ms. Aistrop was hired with the promise of being paid an hourly rate plus a bonus/commission of $175 for each new loan the office sold, plus benefits, including but not limited to, health insurance and clothing allowance.

4

15. Ms. Aistrop worked closely with Defendant Huff and under his direct supervision. He made decisions affecting hiring, work assignments, compensation, discipline, and firing for staff in the Kingsport office, including Ms. Aistrop.

16. The total size of the staff that worked in the Kingsport office was approximately five or fewer employees. Some of those employees were independent loan officers or part-time workers who were not consistently in the office. Thus, Ms. Aistrop found herself often working alone with Defendant Huff.

17. Soon after Mr. Huff hired Ms. Aistrop, he began making inappropriate and unwanted comments, jokes, and advances of a sexual nature toward her and made clear to her that he was sexually attracted to her. Ms. Aistrop initially brushed off the comments as she tried to maintain a professional relationship with Mr. Huff and succeed at her job.

18. By early 2017, Defendant Huff's behavior toward Ms. Aistrop had become more belligerent and aggressive, especially when he drank alcohol or was on other intoxicating substances. He would routinely make advances toward her and become angry when she rejected his advances.

19. Ms. Aistrop began to fear being near Defendant Huff when he was drinking, so much so that she asked a friend to accompany her to an after-hours work event in early February 2017, where she knew Mr. Huff would be drinking. Indeed, at this event, Defendant Huff, who was visibly intoxicated, became angry at Ms. Aistrop when she refused to dance with him. He propositioned her for sex, yelled and cursed at her when she refused him, bragged to her about being able to sleep with other women, and then called her several times throughout the evening after she left the event. The day after this event, Defendant Huff, apparently still intoxicated, called Ms. Aistrop over 30 times and called her such derogatory names as "a nigger-loving,

Mexican-loving piece of shit."

20. Ms. Aistrop was intimidated by Mr. Huff and knew that, as the owner/manager of multiple businesses and properties in the small community in Kingsport, he had significant influence in the community. She also was trying to establish a career in the mortgage industry and worried that her chances of being self-sufficient in that community would be affected if she reported Mr. Huff or made a "big deal" about his behavior toward her. She attempted to continue working with Mr. Huff while making it clear to him that she had no interest in a romantic relationship with him.

21. Over the course of 2017, it became more common for Defendant Huff to be drinking or intoxicated at work, and his behavior toward her became increasingly and pervasively hostile and abusive. He routinely told Ms. Aistrop that he was crazy about her, expressed how attractive he thought she was, and would touch her in unwanted ways, such as by trying to lift up her skirt, put his hand on her leg, lick her shoulder, or caress her hair. He routinely made comments to her alluding to wanting to engage in sexual activities with her, such as by asking if she wanted a "poke and giggle," and referred to himself as "big daddy" while asking her to "be nice to big daddy" or "sit on big daddy's lap." On one occasion in June 2017, Defendant Huff forced himself into the bathroom where he knew Ms. Aistrop was changing, despite her protests.

22. At times, Mr. Huff requested that Ms. Aistrop work with him at his personal residence, either because he was too intoxicated to drive to work or because he had personal business at his residence for which he wanted to be present. On at least one occasion while working with Ms. Aistrop at his residence, Defendant Huff asked her to have sex with him since they were alone, and he said no one would ever know.

23. Defendant Huff routinely asked Ms. Aistrop to spend time with him on weekends

and after work hours, which she routinely refused. He would become extremely angry with her when she refused to see him or take his calls on weekends, and he often yelled and cursed at her over this. He also would become very jealous if he knew or believed that she was spending time with other people, particularly men.

24. Defendant Huff made a habit of driving by Ms. Aistrop's home on evenings or weekends, noting the cars that were in her driveway and sometimes sending her pictures showing that he knew she had a visitor at her house. He would often ask her who she was spending time with and want to know if she was spending time with any men.

25. Defendant Huff's jealousy became so severe that Ms. Aistrop limited her interactions with male co-workers at the office out of fear that Huff would become upset and berate her, and because he instructed her not to assist them.

26. On multiple occasions, Defendant Huff "fired" Ms. Aistrop in fits of anger after she rejected or ignored his advances or made clear that she was not interested in spending time with him socially. Soon after "firing" her, he would contact her, apologize for his behavior, and plead with her to continue working with him.

27. Defendant Huff also routinely sexually propositioned Ms. Aistrop by offering her money or other material benefits in exchange for sexual favors or spending time with him socially. He spoke to her about how beneficial it would be for her if he was her boyfriend, offering her money for her affection, and telling her that it would pay for her to be in his good graces.

28. The sexual harassment that Ms. Aistrop suffered at the hands of her supervisor became so severe and pervasive that in December 2017, she started recording telephone calls and office interactions with Defendant Huff. These recorded conversations demonstrate Defendant Huff's typical drunken and intoxicated behavior and show how his attitude toward Ms. Aistrop

7

Case 2:19-cv-00171-PLR-CRW   Document 1   Filed 10/07/19   Page 7 of 18   PageID #: 7

fluctuated (often in the same conversation) between his unwanted and unreciprocated doting on Ms. Aistrop to anger and threats directed at her.

29. Other typical conversations with Defendant Huff included such things as him asking her what she was wearing under her clothes and calling her from home to tell her he was wearing only his boxers. Ms. Aistrop consistently made clear to Defendant Huff that she did not reciprocate his feelings toward her or appreciate the way he spoke to her.

30. Ms. Aistrop consistently felt intimidated by Defendant Huff. She worried that he would ruin her reputation and career opportunities, and she often felt physically threatened by him. He made threats that he would hit her, made comments about how she would look with blood dripping from her lip, and advised her that she ought to wear a helmet in case he decided to attack her. On more than one occasion, he has made sudden movements toward Ms. Aistrop as if he intended to hit her. He has acknowledged when doing this that he did it intentionally with the purpose of making Ms. Aistrop fear imminent harm.

31. On more than one occasion, Defendant Huff has also reached for Ms. Aistrop's throat in an apparent attempt to scare her into believing that he would choke her. On one occasion, she grabbed a nearby yard stick to ward Defendant Huff away from her. She never knew when his rage toward her would become physical and feared for her safety around him. She told her mother that if anything should happen to her or she should disappear, the prime suspect should be Defendant Huff.

32. Throughout 2018, Defendant Huff also told Ms. Aistrop that she should look for other career opportunities, that he was going to cut her hours and/or discharge her because he wanted to replace her with someone younger. He commented about Ms. Aistrop being 50 years old and said repeatedly that he needed to hire younger women. He also said the younger female

8

workers that he wanted to hire were "more stable" because they were married but also willing to do things that Ms. Aistrop was not willing to do and would spend time with Defendant Huff after hours.

33. Defendant Huff had instructed Ms. Aistrop and other employees that they were never to bother corporate management or go behind his back to involve them in the affairs of the Kingsport office. In the Kingsport office, Defendant Huff was the highest-ranking supervisor. Ms. Aistrop did not know anyone from the corporate office and was worried about how Defendant Huff would react if he learned that she complained about him to corporate management. For these reasons, Ms. Aistrop attempted to deal with Defendant Huff's harassment on her own.

34. By July 2018, however, Ms. Aistrop did contact Defendant Contour's Human Resources manager, Nicole Avram, to complain about the way Defendant Huff treated her. In this conversation, Ms. Aistrop talked about Mr. Huff's unpredictable hostility toward her, that she felt like her job was in jeopardy, and that she was concerned that Mr. Huff would make it difficult for her to work in their small town if she angered him. She also told Ms. Avram about specific incidents of sexual harassment, such as one incident in which Defendant Huff confronted her while she was at the copy machine and licked her shoulder. Ms. Aistrop expressed fear about the repercussions for her future and her career if Mr. Huff learned that she complained about him to corporate. She also relayed to Ms. Avram that Defendant Huff had said he would replace her with a younger employee. Ms. Aistrop also talked to Contour CEO Arthur Most about some of her concerns and her fear of how Mr. Huff would react if he knew she had complained about him.

35. Upon information and belief, Defendant Huff's philandering, drunken, and abusive behavior toward women is known in his community and to employees and supervisors of Contour Mortgage Corporation.

36. The hostile environment that Ms. Aistrop experienced at work from Defendant Huff continued after she reported his behavior to corporate management. On multiple occasions, Defendant Huff acknowledged to Ms. Aistrop how badly he had treated her and promised to treat her better; however, he continued to come to work intoxicated and to call Ms. Aistrop after hours while intoxicated, seeking affection from her, complaining about her not being interested in him, and berating and verbally abusing her. He accused her of being the reason why the office had not sold more loans and continued to threaten to replace her with a younger female employee.

37. By October 2018, Defendant Huff was continuing his hostile, abusive, and threatening behavior toward Ms. Aistrop, despite Ms. Aistrop's multiple conversations with HR Manager Ms. Avram about him. At various times, Defendant Huff told Ms. Aistrop that he was still "sweet on" her, that he loved working with her, and that he wanted to replace her with a younger female employee. He continued to beg her to spend time with him after work hours, such as by going out to dinner with him, and continued to get angry and jealous when she rejected his requests.

38. At some point in late September or early October 2018, Defendant Huff confronted Ms. Aistrop to let her know that he had gone through her personal belongings on her desk at work and discovered that she had been keeping notes about some of her interactions with him.

39. On or about October 12, 2018, Ms. Aistrop was working in the office alone with Defendant Huff when he became angry at her and put his hands around her neck as if to choke her. This was not the first time he had made such gestures toward her, but this time he appeared genuinely angry and intent on intimidating her, and he physically held her throat with both hands instead of one hand as he had done in the past.

40. Defendant Huff also continued to offer monetary benefits to Ms. Aistrop if she

10

would engage in a relationship with him, and he held over Ms. Aistrop's head the fact that she had borrowed $5,000 from him in August 2017. At that time, in response to Ms. Aistrop expressing financial concerns due to the office under-performing, Mr. Huff offered what he described to Ms. Aistrop as an advance on her expected commissions. Later, Ms. Aistrop discovered that the "advance" had been paid by Mr. Huff personally and not Contour Mortgage, so she insisted on providing a promissory note evidencing her intent to pay the funds back to Defendant Huff. On or around October 23, 2018, Mr. Huff suggested to Ms. Aistrop that he would consider the note paid for some "consideration," by which he meant sexual favors. Ms. Aistrop, of course, rejected his proposal.

41. Throughout October 2018, Defendant Huff was regularly driving by Ms. Aistrop's house, making unannounced and unwelcome visits to her door, and calling her several times in an evening and over weekends. Ms. Aistrop felt so unsafe that she started packing up her house so that she could move into her camper at a location that she would not reveal to him.

42. In October 2018, Ms. Aistrop's situation at work had become unbearable, and she again sought the assistance of Defendant Contour's HR Manager Ms. Avram. Ms. Avram suggested that Ms. Aistrop should resign her employment from the Contour Kingsport office and "leave on the best terms possible," by thanking Defendant Huff for the opportunities he had given her. Ms. Avram acknowledged that no investigation had been done into Mr. Huff's behavior and treatment toward Ms. Aistrop, blaming her for the lack of an investigation because Ms. Aistrop had expressed concerns about retaliation. Ms. Avram also indicated that Ms. Aistrop's complaints of sexual harassment were not specific enough, even though Ms. Avram acknowledged that Ms. Aistrop had previously reported specific incidents of harassment to her.

43. On October 30, 2018, Ms. Aistrop sent to Ms. Avram a 43-minute audio recording

taken from the office a few days earlier, during which Defendant Huff repeatedly tries to pressure Ms. Aistrop to go out to dinner with him, expresses jealousy when Ms. Aistrop says she has dinner plans already, and complains that Ms. Aistrop is "hateful" when she does not let him touch her. At one point, Ms. Aistrop threatened to spray Mr. Huff with a can of furniture polish she grabbed from her desk to keep him away from her.

44. In response to Ms. Aistrop's complaints and request that she not be forced to work with Defendant Huff anymore, Defendant Contour put Ms. Aistrop on paid administrative leave by the beginning of November. Ms. Aistop agreed to this as a temporary arrangement while Contour investigated her allegations against Defendant Huff and the parties could decide on a permanent path going forward.

45. Defendant Contour later informed Ms. Aistrop that if she took and passed the licensure exam to become a mortgage loan officer that she could continue to work for Contour as a loan officer. However, this was not the position for which Ms. Aistrop had been hired or agreed to work.

46. Although Defendant continued to pay Ms. Aistrop until June 30, 2019, her pay was less while on leave than it would have been if she had been permitted to carry out the functions of her job because she could not earn commissions while on leave.

47. Ms. Aistrop had difficulty passing the licensure exam, in large part due to the effects of the hostile work environment and her severe emotional distress. She notified Defendant Contour when she was under a doctor's care during this time.

48. On or about June 30, 2019, Defendant Contour informed Ms. Aistrop that it was "suspending" her employment and pay because of her failure to pass the mortgage loan officer licensure exam. Defendant Contour also informed Ms. Aistrop that the mortgage loan officer job

12

Case 2:19-cv-00171-PLR-CRW   Document 1   Filed 10/07/19   Page 12 of 18   PageID #: 12

was a commission-only job without a salary. The job she had been hired to do included a salary with commissions for each new loan sold.

49. Upon information and belief, Defendant Huff continues to work for Contour Mortgage Corporation and has never been suspended without pay or otherwise faced any significant disciplinary actions over his sexual harassment toward Ms. Aistrop.

50. The last time Ms. Aistrop spoke to Defendant Huff was on or around November 15, 2018. On that day, Defendant Huff called Ms. Aistrop even though he acknowledged and complained about Contour HR telling him that he was not to contact her. Mr. Huff said that he did not care what HR or any lawyers told him to do, that he missed Ms. Aistrop and needed to talk to her. As she always did, Ms. Aistrop did not reciprocate Mr. Huff's feelings. In the same conversation, Mr. Huff also commented that he would like to take Ms. Aistrop to the Contour Christmas party with a bloody nose.

51. After placing Ms. Aistrop on administrative leave, Defendants Huff and Contour hired a substantially younger woman to take her place. The woman hired was the same woman who Defendant Huff had been saying he would hire to replace Ms. Aistrop several months before Ms. Aistrop was placed on administrative leave.

52. In March 2019, Ms. Aistrop filed a charge of discrimination with the EEOC, alleging sexual harassment, sex discrimination, age discrimination, and retaliation. Defendant Contour has defended Ms. Aistrop's charge by alleging that she had a long-standing consensual relationship with Defendant Huff.

53. Upon information and belief, Defendant Huff falsely informed the managers at Contour Mortgage Corporation and countless unknown other individuals, that she had consented to a sexual relationship with him. Furthermore, Ms. Aistrop learned on or around September 27,

2019, during a conversation with the EEOC investigator, that Defendants Huff and Contour were also falsely and disparagingly alleging that Ms. Aistrop was Mr. Huff's scorned ex-lover.

54. Ms. Aistrop never had a romantic or sexual relationship with Mr. Huff. Mr. Huff repeatedly acknowledged that Ms. Aistrop was not interested in him, and in fact, on multiple occasions complained about how badly it made him feel that she showed no interest in him. Any comments made by him or any other Contour managers stating that she had a consensual romantic or sexual relationship with him is a knowing falsehood stated with the effect of ruining Ms. Aistrop's reputation, causing her to lose her job with Contour and other jobs in the Kingsport area, and preventing her from obtaining redress for the sexual harassment she suffered while employed by Defendant Contour under the supervision of Defendant Huff.

55. Defendant Huff, as Ms. Aistrop's supervisor and employee of Defendant Contour, subjected Ms. Aistrop to severe and pervasive harassment because of her sex and in retaliation for rejecting his sexual advances.

56. Defendants Huff and Contour removed Ms. Aistrop from her job position, cut her pay, and ultimately replaced her with a younger worker because of discrimination based on her sex and in retaliation for complaining about sexual harassment.

57. Defendant Contour decided to change the terms and conditions of Ms. Aistrop's job, and ultimately terminated her employment because of her sex and age and in retaliation for her complaints about sexual harassment in the workplace.

58. As a result of the Defendants' unlawful actions, Ms. Aistrop has incurred lost wages and benefits, loss of future wages and benefits, and has suffered severe emotional distress, mental anguish, embarrassment, and harm to her reputation, among other damages.

59. Defendants' unlawful actions were done intentionally, fraudulently, maliciously,

14

Case 2:19-cv-00171-PLR-CRW   Document 1   Filed 10/07/19   Page 14 of 18   PageID #: 14

and/or with reckless indifference to the law.

## VI. CAUSES OF ACTION

### Count I: Sex Harassment, Discrimination, and Retaliation

60. Plaintiff re-alleges and incorporates paragraphs 10-59.

61. Defendant Contour subjected Plaintiff Aistrop to a hostile work environment because of her sex and in retaliation for her opposition to and/or reports of unlawful harassment, in violation of Title VII and the THRA.

62. Defendant Contour's actions in response to Plaintiff Aistrop's complaints of sexual harassment constitute adverse employment actions because of her sex and in retaliation for her complaints of sexual harassment, in violation of Title VII and the THRA.

63. Defendant Contour discharged Plaintiff Aistrop because of her sex and in retaliation for her complaints of sexual harassment, in violation of Title VII and the THRA.

### Count II: Age Discrimination

64. Plaintiff re-alleges and incorporates paragraphs 10-59.

65. Defendant Contour discharged Ms. Aistrop because of her age, in violation of the ADEA and THRA.

### Count III: Common Law Assault and Battery

66. Plaintiff re-alleges and incorporates paragraphs 10-59.

67. Defendant Huff's actions in placing his hands on Ms. Aistrop and/or threatening harm to her, with the intent to actually harm or cause fear of harm, constitute assault and battery

15

under Tennessee common law.

68. Defendant Huff's assaults against Ms. Aistop were done while Defendant Huff was acting in the course and scope of his employment, and therefore Defendant Contour is vicariously liable for his actions.

### Count IV: Malicious Harassment

69. Plaintiff re-alleges and incorporates paragraphs 10-59.

70. Defendant Huff's actions constitute malicious harassment, in violation of Tenn. Code Ann. § 4-21-701.

71. Defendant Huff's actions constituting malicious harassment were done during the course and scope of his employment and position as Plaintiff's supervisor, and thus, Defendant Contour is vicariously liable for his actions.

### Count V: Intentional Infliction of Emotional Distress

72. Plaintiff re-alleges and incorporates paragraphs 10-59.

73. Defendant Huff's actions constitute intentional infliction of emotional distress under Tennessee common law.

74. Defendant Huff's actions constituting intentional infliction of emotional distress were done during the course and scope of his employment and position as Plaintiff's supervisor, and thus, Defendant Contour is vicariously liable for his actions.

### Count VI: Defamation

75. Plaintiff re-alleges and incorporates paragraphs 10-59.

76. Defendant Huff's actions constitute liable and slander under Tennessee common law.

77. Defendant Huff's actions constituting liable and slander were done during the course and scope of his employment and position as Plaintiff's supervisor, and thus, Defendant Contour is vicariously liable for his actions.

78. Defendant Contour's actions constitute liable and slander under Tennessee common law.

## VII. PRAYER FOR RELIEF

79. WHEREFORE, Plaintiff prays that she be granted the following relief:

    (a)    Enter judgment against Defendants, and declare that the actions of Defendants violate federal and state law;

    (b)    Enjoin Defendant Contour from further unlawful and retaliatory employment practices;

    (c)    Enjoin Defendant Huff from further acts of harassment, assault and battery, and infliction of emotional distress against Plaintiff;

    (d)    Enjoin both Defendants from further defamatory statements against Plaintiff;

    (e)    Order Defendant Contour to pay Plaintiff Aistrop back pay, lost benefits, and other pecuniary losses proximately caused by Defendant's unlawful conduct;

    (f)    Order Defendant Contour to reinstate Plaintiff Aistrop, or, in the alternative, to pay Plaintiff Aistrop front pay and the value of future lost benefits;

    (g)    Order Defendants to pay Plaintiff Aistrop compensatory damages for

mental and emotional distress, harm to her reputation, and other non-tangible injuries, in amounts to be determined by a jury;

(h) Order Defendants to pay Plaintiff Aistrop for any tangible losses and injuries she sustained as a result of their tortious actions;

(i) Order Defendants to pay Plaintiff Aistrop punitive damages in an amount to be determined by a jury;

(j) Order Defendant Contour to pay liquidated damages;

(k) Order Defendants to pay all costs, disbursements, pre-judgment interest, post-judgment interest, expert witness fees, and reasonable attorney's fees as allowed by law; and

(l) Grant Plaintiff Aistrop such further relief as she is entitled to under law and/or as the Court deems just and proper.

80. Plaintiff Aistrop requests a jury trial in this cause.

Respectfully Submitted,

s/ *Jennifer B. Morton*
Jennifer B. Morton, BPR #015585
Maha M. Ayesh, BPR #025244

JENNIFER MORTON LAW, PLLC
8217 Pickens Gap Road
Knoxville, TN 37920
(865) 579 0708
(865) 579-0787 (fax)
jen@jmortonlaw.com
maha@jmortonlaw.com

**ATTORNEYS FOR PLAINTIFF LORA AISTROP**